152 P.3d 16

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Jeremy Richard HENAGE,
Defendant–Appellant.**

No. 31205.

Supreme Court of Idaho,
Boise, November 2006 Term.

Jan. 26, 2007.

Molly J. Huskey, State Appellate Public Defender, Boise, for appellant. Sara B. Thomas argued.

Honorable Lawrence G. Wasden, Attorney General, Boise, for respondents. Lori A. Fleming argued.

JONES, Justice.

This case involves a routine traffic stop that turned into a contraband-yielding roadside pat down search. Jeremy Henage appeals from the district court's denial of his motion to suppress evidence a police officer discovered while searching Jeremy's person. We reverse.

## I.

This case commenced when the Jerome City Police cited Jeremy Henage for possession of a controlled substance and drug paraphernalia following a traffic stop. Officer Johnson was on patrol when he stopped a vehicle with a broken taillight. Jeremy was a passenger in the subject vehicle and his brother, Zach, was the driver. Officer Johnson conversed with Zach about the taillight. Sergeant Baker arrived shortly after the initial stop and approached Jeremy while he was still in the vehicle. Sgt. Baker told Jeremy he was not under arrest and was free

to go, but that he wanted to talk to him "about some things." He stated that Jeremy was "nervous, but he was real cooperative and he was polite," and agreed to answer his questions. Jeremy exited the vehicle and Sgt. Baker asked if he could search the vehicle. Jeremy declined, stating that the vehicle belonged to his father. Sgt. Baker then asked Jeremy if he had any contraband on his person and Jeremy responded that he had a knife. Sgt. Baker proceeded to perform a pat down search of Jeremy. After Sgt. Baker retrieved the object for which he was searching, Jeremy specified that it was a Leatherman and Sgt. Baker resumed the search. As the search continued, he "felt a large hard object in one of [Jeremy's] cargo pockets." When asked what the object was, Jeremy responded that he did not know. Sgt. Baker reached into the pocket and removed two objects, which he identified as a glass pipe and a cigar tube. Sgt. Baker opened the cigar tube and found a white rock later identified as methamphetamine.

Jeremy was subsequently cited for possession of a controlled substance and drug paraphernalia. He moved to suppress the contraband, contending that the extended questioning and search were illegal under the Fourth Amendment. The district court denied his motion to suppress. Jeremy subsequently entered a guilty plea but reserved the right to appeal the denial of his motion to suppress.

## II.

■ In reviewing an order granting or denying a motion to suppress evidence, this Court will defer to the trial court's factual findings unless clearly erroneous. *State v. Donato*, 135 Idaho 469, 470, 20 P.3d 5, 6 (2001). However, free review is exercised over a trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found. *Id.*

## III.

We address two questions: (1) whether the district court erred in holding that the traffic stop evolved into a consensual encounter prior to Sgt. Baker's extended questioning of Jeremy, and (2) whether the district court

erred in holding that Sgt. Baker's search of Jeremy's person was constitutionally justified.

## A.

■ Jeremy argues that the period of extended questioning conducted by Sgt. Baker constituted a seizure to which Fourth Amendment protections apply. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Traffic stops constitute seizures under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660, 667 (1979); *State v. Silva*, 134 Idaho 848, 852, 11 P.3d 44, 48 (Ct.App.2000). The U.S. Supreme Court has held that traffic stops "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 238 (1983). However, in certain circumstances, a traffic stop may evolve into a consensual encounter to which Fourth Amendment protections do not apply. *State v. Gutierrez*, 137 Idaho 647, 650, 51 P.3d 461, 464 (Ct.App. 2002); *State v. Martinez*, 136 Idaho 436, 441, 34 P.3d 1119, 1124 (Ct.App.2001). The test to determine if an individual is seized for Fourth Amendment purposes is an objective one, evaluating whether under the totality of the circumstances "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389, 399 (1991).

Jeremy does not dispute that he was initially subjected to a lawful detention when his brother was stopped for having a broken taillight. Rather, Jeremy argues that the officers impermissibly extended the traffic stop by continuing to question him beyond the time necessary to effectuate the stop. The district court disagreed, holding that the traffic stop evolved into a consensual encounter before the period of extended questioning. Jeremy contends that the district court erred in holding that the traffic stop evolved

into a consensual encounter because: (1) Officer Johnson failed to return Zach's documentation, and (2) the State failed to prove the officers had deactivated their patrol cars' overhead lights. Jeremy's arguments require us to review the district court's factual findings.

 This Court will not set aside factual findings unless they are clearly erroneous. *Donato,* 135 Idaho at 470, 20 P.3d at 6. To be found clearly erroneous, factual findings must be unsupported by substantial and competent evidence. *State v. Davis,* 139 Idaho 731, 734, 85 P.3d 1130, 1133 (Ct.App.2003). At the suppression hearing, Sgt. Baker testified that once the initial investigation regarding the broken taillight had ended, he and Officer Johnson conferred and, based on police intelligence of previous drug involvement on the part of the brothers, decided to conduct a criminal patrol procedure, which involves an officer-initiated conversation with an individual. At that time, he understood that "[Officer Johnson] had given [Zach's] stuff back." Sgt. Baker further testified that generally before effectuating a criminal patrol procedure, they "return the documents or issue citations or whatever [they] have to do to conclude the traffic stop," and that they followed those procedures in this case. Thus, the district court's finding that the officers returned the driver's information prior to the extended questioning of Jeremy was supported by substantial and competent evidence and was not clearly erroneous.

 Sgt. Baker could not recall whether the overhead lights on the cars had been turned off during the extended conversation with Jeremy. Jeremy testified that Sgt. Baker's overhead lights were no longer going at the time, but that Officer Johnson's were. The district court determined that, although Officer Johnson's overhead lights may have remained activated, it did not preclude the traffic stop from evolving into a consensual encounter. In a factually similar case, the Court of Appeals held that "[i]t is not practical nor necessary that an officer turn off his emergency lights before he may effectively instruct an individual who has been stopped that he may leave." *State v. Roark,* 140 Idaho 868, 871, 103 P.3d 481, 484 (Ct.App.

2004). The court went on to say that "[n]o reasonable person who has been unequivocally told that he may go, as Roark was, would believe that he should disregard the statement merely because the patrol car's overhead lights are still flashing." *Id.* Jeremy, like the defendant in *Roark,* was told by Sgt. Baker that he was free to go and, therefore, the fact that Officer Johnson's overhead lights were activated did not preclude the traffic stop from evolving into a consensual encounter. The district court's finding in this regard is supported by the record.

**B.**

Jeremy contends that even if his continued conversation with Sgt. Baker was consensual at first, it resulted in an illegal search and seizure. According to Jeremy, the encounter took a nonconsensual turn when he told Sgt. Baker he had a knife. That is, Sgt. Baker then directed Jeremy to keep his hands out where he could see them and proceeded with a search, without asking or receiving Jeremy's consent to do so. Jeremy argues that when Sgt. Baker laid hands upon him, the encounter became nonconsensual and constituted an unlawful seizure.

Just as a traffic detention can turn into a consensual encounter, a consensual encounter can turn into a seizure. In *State v. Baker,* 141 Idaho 163, 165, 107 P.3d 1214, 1216 (2004), this Court stated the matter as follows:

An encounter between an officer and a citizen does not trigger Fourth Amendment scrutiny, however, unless it is nonconsensual. *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398 (1991). An encounter becomes a seizure only when an officer, by means of physical force or show of authority, has restrained the liberty of a citizen. *United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497, 508–09 (1980). The test for deciding whether someone has been seized by a show of authority is an objective one. *Id.* at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. The Supreme Court of the United States has held that a seizure occurs "only

if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* Examples of circumstances that might indicate a seizure would be the threatening presence of several officers, the display of a weapon by an officer, physical touching of the person, or the tone or use of language indicating that compliance with an officer's request might be compelled. *Id.* In the absence of some such evidence, otherwise inoffensive contact between a citizen and an officer cannot, as a matter of law, amount to a seizure of that person. *Id.* at 555, 100 S.Ct. at 1877, 64 L.Ed.2d at 509.

Jeremy asserts that the physical touching of his person, without his consent, amounted to a seizure of his person.

The Court is not particularly well positioned to determine this issue on appeal, first, because the record is somewhat sparse regarding the circumstances surrounding the initiation of the search and, second, because the district court did not consider the issue of whether the consensual encounter later turned nonconsensual. However, we need not address the issue because we have determined that the search itself was unreasonable, requiring reversal of the district court's order.

 The Fourth Amendment to the United States Constitution prohibits unreasonable searches. A search conducted by law enforcement officers without a warrant is per se unreasonable unless it falls within one of the narrowly drawn exceptions to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854, 858 (1973). One such exception allows an officer to conduct a limited self-protective pat down search of a detainee in order to remove any weapons. *State v. Wright,* 134 Idaho 79, 82, 996 P.2d 298, 301 (2000). "Such a search is allowed to permit a police officer to conduct the inquiry without fear of violence being inflicted upon the officer's person." *State v. Rawlings,* 121 Idaho 930, 933, 829 P.2d 520, 523 (1992). "Whether an officer may reasonably justify such a search is evaluated in light of the 'facts known to the officers on the scene and

the inference of the risk of danger reasonably drawn from the totality of the circumstances.'" *Wright,* 134 Idaho at 82, 996 P.2d at 301. In determining the reasonableness of the search, the court employs an objective standard. The U.S. Supreme Court laid out the nature of the inquiry in *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889, 905–06 (1968):

> And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

 Thus, in determining whether Sgt. Baker's pat down search of Jeremy was justified, one must determine whether Sgt. Baker had objective grounds for believing that Jeremy posed a risk of danger to himself or others. At this juncture, the parties, while both pointing to the same language in *Terry,* urge differing interpretations of that language. The language at issue is:

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief

that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

Jeremy reads this language as requiring a finding by the court that the prospective friskee is both armed and dangerous. On the other hand, the State contends that an individual need not be shown to be both armed and dangerous in order to justify a pat down for weapons. According to the State, if a person is armed, he is sufficiently dangerous to justify a pat down search. In support of its position, the State cites *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) a per curiam opinion where the Supreme Court, after citing *Terry,* indicated that the bulge in the jacket of a detainee "permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer." *Id.* at 112, 98 S.Ct. at 334, 54 L.Ed.2d at 337–38.

■ Jeremy argues that a person must both be armed and dangerous before a pat down search can be made, while the State argues that a person need only be armed in order to perform such a search. Neither side has grasped the essence of *Terry.* A person can be armed without posing a risk of danger. On the other hand, a person can be dangerous, without apparently being armed. The primary concern of the Supreme Court in *Terry* and its progeny, including *Mimms,* was to protect the safety of officers and others from harm when dealing with a person who may pose a risk. As the *Terry* court put it, "where nothing in the initial stages of the encounter serves to dispel [the officer's] reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons

which might be used to assault him." 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911.

■ Our inquiry then is to determine whether it was objectively reasonable for Sgt. Baker to conclude a pat down search was necessary for the protection of himself or others. The record in this case does not disclose that Sgt. Baker pointed to specific and articulable facts that would reasonably warrant a search for weapons. At the suppression hearing, Sgt. Baker testified to two reasons why he frisked Jeremy: he was acting nervous and he had admitted having a knife. This, during what the State argues was a consensual encounter in which Jeremy was not in any way acting threatening or dangerous, but indeed, according to Sgt. Baker's testimony, was "cooperative" and "polite." Sgt. Baker characterized their conversation as "friendly" and "congenial." He had known Jeremy for several years and never had a combative experience with him.[1] He testified Jeremy had "always been cooperative and polite" with him and that he had "never had a problem with him." Based on their past acquaintance with the Henage brothers, the officers initiated the optional "patrol procedure" not to find evidence of hidden weapons but because of their possible involvement with illicit drugs and, in fact, the first question Sgt. Baker asked of Jeremy was whether he had any contraband. No search had been conducted during the initial stop (when the potential of danger to the officers might have been the greatest), the Henages had been told they could go (the officers apparently having deemed them not to present a danger), and Sgt. Baker specifically told Jeremy he would not arrest him. While evidence that the friskee is under the influence of an illicit drug might serve as an ingredient in the totality of the circumstances inquiry, *see, e.g., State v. Johnson,* 137 Idaho 656, 661, 51 P.3d 1112, 1117 (Ct.App.2002), Sgt. Baker did not learn that Jeremy had consumed any drug until after the search, and did not suspect that Jeremy was under the influence of an illegal drug. In short, Sgt. Baker did not connect Jeremy's ner-

---

1. Sgt. Baker said he had been to situations where Jeremy had been in altercations but did not elab-orate and did not say Jeremy had ever been involved in an altercation with a police officer.

vousness with anything tending to demonstrate a risk to his safety.

Nor did Sgt. Baker articulate any furtive movements or behavior from which a person in Sgt. Baker's position could reasonably conclude Jeremy posed any risk. Jeremy made no suspicious movements for his pockets or other area from which a weapon might be readily retrieved. *See and compare United States v. Davis,* 202 F.3d 1060, 1063 (8th Cir.2000) (officer encountering two individuals in known troubled area justified in frisking individual where, during frisk of defendant's cohort, defendant moved behind officer, adjusted his jacket, and inserted his hand into his jacket pocket); *see also United States v. Thomas,* 863 F.2d 622, 629 (9th Cir.1988). Add this to the fact that Sgt. Baker actually *returned* the Leatherman to Jeremy, and we simply cannot say that the totality of the circumstances creates a reasonable inference that Jeremy posed a risk to the safety of Sgt. Baker or others.

The State argued that Jeremy's admission to carrying a knife was, by itself, sufficient to create in the officer a reasonable belief that Jeremy posed a safety risk. Sgt. Baker testified that "[o]nce a person tells me they're in possession of a weapon, it compromises my safety." To be sure, Jeremy's admission established that he had a knife of some sort. And we are mindful of the substantial risk our peace officers face while in the field. However, Sgt. Baker did not testify to any fact that demonstrated Jeremy presented a potential threat to him or others and, in fact, acknowledged that Jeremy was in no way threatening to him.

This Court defers to the factual findings of the district court unless those findings are clearly erroneous. Therefore, we must review the facts that the district court relied upon to reach its conclusion. While considering the propriety of the search, the court found: "Upon learning that the defendant had a knife on his person, and the continued nervous behavior exhibited by the defendant, the officer felt that his safety had been compromised and he proceeded to search the defendant for weapons." Thus, the court, after reviewing the evidence, found that Jeremy had told Sgt. Baker he had a knife, that

Jeremy exhibited continued nervous behavior, and that Sgt. Baker felt his safety had been compromised, and determined that such facts justified the search. The first two findings have some support in the record and we will not second guess them. However, the finding that Sgt. Baker "felt" his safety had been compromised is flawed for two reasons—it is not supported by Sgt. Baker's testimony and it appears to be based on a subjective standard. The only evidence upon which the court could have based Sgt. Baker's feeling that his safety had been compromised was Jeremy's nervousness and the officer's statement that "once a person tells me they're in possession of a weapon, it compromises my safety." However, this does not constitute the type of specific and articulable fact necessary to justify initiating a search under *Terry.* Sgt. Baker did not particularize this general statement to Jeremy, a person who had never given him any trouble, and he testified to an amiable, non-threatening consensual encounter.

The district court based its determination that Sgt. Baker was justified in initiating the weapons search upon a subjective feeling attributed to Sgt. Baker rather than a determination as to "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. According to the district court: "Upon learning that the defendant had a knife on his person, and the continued nervous behavior exhibited by the defendant, the officer *felt* that his safety had been compromised and he proceeded to search the defendant for weapons." (emphasis added.) Weapons searches are not justified by an officer's subjective feeling, especially when that feeling is not particularized to a particular individual in a specific fact situation. Rather, the court must find that the officer has presented specific facts that can be objectively evaluated to support the conclusion that the subject of the intended search posed a potential risk. That is not the situation here.

## IV.

The evidence obtained during the search should have been suppressed. The district court's order denying Jeremy's motion to suppress is reversed and Jeremy's conviction is vacated. This case is remanded for proceedings consistent with this opinion.

Justice KIDWELL, Pro Tem concurs.

Chief Justice SCHROEDER, Specially Concurring.

In the aftermath of the reality of Henage possessing drugs it is tempting to find a rationalization for justifying the search. However, wrapped around the overlays of *Terry* interpretation is a simple concept of personal privacy and security. Once the traffic stop was completed and Henage was free to leave, this encounter was no different from any person going to work or shopping or using leisure time. A police officer may, of course, talk to people and may ask questions. That does not mean the encounter can be escalated into a search without a reasonable belief that the person poses a danger. Standing outside the entrance to a corporate office or a shopping mall and asking the employees or customers who enter if they have contraband or a knife, or anything else that might be used as a weapon would probably yield a fair number of affirmative answers. One can only speculate how many men, women and children carry a knife, or pocket knife, or fingernail file or a pair of scissors, or permitted concealed weapon. While the question may be asked, an honest answer in the affirmative does not lead to the conclusion that the person may be searched absent an objectively reasonable belief that the person poses a danger. Special exceptions to a warrant requirement for a search have been drawn. This is not one of them.

Justice EISMANN, Concurring in the Result.

Under the Fourth Amendment to the Constitution of the United States, a search must be reasonable under the totality of the circumstances. *Samson v. California*, —— U.S. ——, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). "Whether a search is reasonable 'is deter-mined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* at ——, 126 S.Ct. at 2197, 165 L.Ed.2d at 256.

A temporary seizure for the purpose of questioning (a *Terry* stop) is justifiable under the Fourth Amendment if the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). If the officer reasonably believes he or she is dealing with an armed and dangerous individual, the officer may also frisk the person for weapons. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In the context of a *Terry* stop, a detainee who is armed is considered dangerous. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

In *Pennsylvania v. Mimms*, the officer stopped the vehicle being driven by Mimms for an expired license plate. He told Mimms to get out of the car and produce his owner's card and operator's license. When Mimms alighted from the car, the officer noticed a large bulge under Mimms's sports jacket. Fearing that it might be a weapon, the officer frisked Mimms and found a loaded revolver in his waistband. Upon seeing the bulge, the officer was authorized to frisk Mimms without having to eliminate the possibility that Mimms was armed but not dangerous. As the Supreme Court stated, "The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer." *Id.* at 112, 98 S.Ct. at 334, 54 L.Ed.2d at 337–38. The right to frisk can arise simply from the nature of the possible crime the officer is investigating. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the officer observed Terry and two others apparently casing a store for a robbery. The very nature of the crime they appeared to be planning (robbery) gave the officer reason to believe they may be armed and therefore dangerous, justifying the frisk. As the Supreme Court stated at

**664**

392 U.S. 28, 88 S.Ct. at 1883, 20 L.Ed.2d at 910:

> He [the officer] had observed Terry, together with Chilton and another man, acting in a manner he took to be preface to a "stick-up." We think on the facts and circumstances Officer McFadden detailed before the trial judge a reasonably prudent man would have been warranted in believing petitioner was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior. The actions of Terry and Chilton were consistent with McFadden's hypothesis that these men were contemplating a daylight robbery which, it is reasonable to assume, would be likely to involve the use of weapons. . . .

The pat down in the instant case occurred during a police-initiated, consensual encounter between Henage and the officers. The officers were not detaining Henage because they possessed a reasonable, articulable suspicion that he had committed or was about to commit any crime. In my opinion, that changes the balancing of the degree to which the pat down intrudes upon an individual's privacy with the degree to which it is needed for the promotion of legitimate governmental interests. Under the totality of the circumstances in this case, Henage's statement that he had a knife in his pocket did not justify a pat down search. No reasonable person could have concluded, under the circumstances in this case, that Henage posed a danger to the officers.

Justice BURDICK concurs.