**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 47308**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **Boise, December 2019 Term** |
| | ) | |
| **v.** | ) | **Opinion Filed: July 27, 2020** |
| | ) | |
| **JENNIE LYNN PYLICAN,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **Defendant-Respondent.** | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Jonathan Medema, District Judge.

The order of the district court is <u>reversed</u>, and the case is <u>remanded</u> for further proceedings.

Lawrence G. Wasden, Idaho Attorney General, Boise, for appellant State of Idaho. Kenneth K. Jorgensen argued.

Eric D. Fredericksen, State Appellate Public Defender, Boise, for respondent Jennie Lynn Pylican. Sally J. Cooley argued.

_____

MOELLER, Justice.

This appeal rises from the district court's order granting Jennie Pylican's motion to suppress evidence that she unlawfully possessed methamphetamine and drug paraphernalia on the evening of October 12, 2017. An officer observed Pylican enter a storage facility after hours. When she left, the officer followed and observed her make a turn without signaling. Pylican was initially stopped for the traffic violation and later questioned about her presence in a storage facility after hours. The district court granted the motion, holding that the arresting officer unconstitutionally extended the stop when he questioned Pylican regarding her presence in the storage facility. In the alternative, the district court ruled that the officer unconstitutionally extended both the scope and duration of the seizure by requiring Pylican to exit her car. The State timely appealed.

The Idaho Court of Appeals heard the State's appeal in *State v. Pylican*, No. 45999, 2019 WL 2070468 (Ct. App. May 10, 2019). In an unpublished opinion, the appellate court affirmed the district court's order granting Pylican's motion to suppress, holding that the officer did not provide any evidence of suspicious activity at the storage facility that would justify Pylican's extended detention on that basis. *Id.* at \*5. The State filed a petition for review to this Court, which we

1

granted. The State argues that the district court erred in granting Pylican's motion to suppress because (1) the deputy had reasonable suspicion to question Pylican regarding her presence in the storage facility, and (2) the deputy's order to exit the vehicle did not unconstitutionally extend the duration of the stop. For the reasons set forth below, we reverse the district court's order and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Late on the evening of October 12, 2017, an Ada County Sheriff's deputy was patrolling the area near the Trust Storage Facility on Maple Grove Road in Boise, Idaho. A sign outside the facility indicated that the hours of operation were 8:00 a.m. to 10:00 p.m. The storage facility had a coded gate. On prior occasions, the deputy had witnessed several individuals attempt to enter the facility after hours, but those individuals had been unable to gain entry. At approximately 11:55 p.m., the deputy observed a Mazda sedan in the parking lot of an apartment complex near where he had parked his patrol vehicle. He watched the Mazda as it drove toward the storage facility. Other vehicles on the road obstructed the deputy's view so that he did not witness the Mazda drive up to and enter through the facility's gate; however, he noticed that the storage facility's gate was closing and that the Mazda had gained access to the facility.

Concerned that the Mazda had entered the storage facility after hours, the deputy initiated a call to dispatch regarding a suspicious vehicle and requested assistance. The area near the storage facility had had frequent reports of vehicle and residential burglaries. The deputy testified that he was suspicious that the occupants of the vehicle might "be either breaking into storage units or doing other type of activity that's obviously not conducive to the safe neighborhood."

The deputy approached the storage facility in his SUV, but waited for other officers to arrive before approaching on foot. The other officers arrived shortly after his request for assistance. One of the other officers communicated that there was a second vehicle inside the storage facility. The deputy, as well as the other officers on the scene, exited their vehicles and approached the storage facility on foot in order to "make contact with the vehicles inside and see what they were doing in there." However, as the officers neared the entrance to the storage facility, they witnessed several individuals getting into the vehicles. The officers elected to return to their vehicles and wait until the drivers exited the storage facility before initiating contact. The Mazda left the storage facility just after 12:30 a.m.

2

Approximately thirty-five minutes had elapsed from the time the Mazda entered the storage facility to the time that it exited. Although the deputy had watched the vehicle and storage facility for over forty minutes, he did not observe Pylican engage in any criminal activity inside the storage facility. The deputy could only see the vehicle parked inside the storage facility and some movement near the car.

After the Mazda exited the facility, the deputy followed it. The Mazda turned from the main road into the same apartment complex from which it had come before it went to the storage facility. However, because the driver failed to use the turn signal, the deputy initiated a traffic stop. There were two occupants of the car: the driver, Pylican, and her passenger, Megan O'Reilly. The deputy informed Pylican that he stopped her because of the traffic violation and "for being in the storage facility after hours."

In response to the statement regarding her presence in the storage facility, Pylican stated that she and her husband were switching storage units. The deputy asked her about being inside the facility after hours. In response, Pylican stated that the storage facility allowed people to be inside after hours as long as they were inside before 10:00 p.m., and that she had entered the storage facility prior to that time. The deputy believed Pylican had lied because he had witnessed the Mazda enter the facility after 10:00 p.m.

After obtaining information from Pylican and her passenger, the deputy told Pylican he would take a few minutes and then he would "cut [them] loose." As he walked away from Pylican's vehicle, before checking any of Pylican's information, he noticed that the K-9 officer had arrived. After quickly conferring with the K-9 officer, the deputy ordered Pylican and her passenger to exit the vehicle. The proffered reason for Pylican and her passenger to exit the vehicle was for the safety of the officers while the dog was led around the car. Pylican and the passenger were escorted to the area in front of the patrol car.

After Pylican and her passenger were escorted from the car, the K-9 officer ran his dog around the exterior of the vehicle. While the K-9 officer executed the canine search, the deputy denied Pylican's request to call her husband, and instead initiated another conversation with Pylican regarding her presence in the storage facility. With the K-9 search still in progress, the deputy contacted dispatch to run a warrant check on both Pylican and her passenger, and to confirm that Pylican had a valid driver's license. Approximately two minutes had elapsed from the time the deputy had ordered Pylican and her passenger from the car to the time that the deputy first

3

contacted dispatch. Meanwhile, the dog alerted outside the driver's side of the vehicle. As a result, the K-9 officer deployed the dog inside the vehicle, at which time the dog alerted on a backpack in the back seat. The K-9 officer hand searched the backpack and found drug paraphernalia.

After the K-9 officer searched the vehicle, he spoke with the deputy about what he had found. Near that time, dispatch informed the deputy that Pylican's passenger had an outstanding warrant. A short time later, Pylican was arrested for the items in the backpack. After the deputy arrested Pylican, he performed a more extensive search of Pylican's vehicle. He located a contact lens case containing methamphetamine underneath the center console.

Based on these facts, Pylican was charged by information with one count of possession of a controlled substance (methamphetamine) under Idaho Code section 37-2732(c), and one count of possession of drug paraphernalia under Idaho Code section 37-2734A. Pylican moved to suppress the evidence obtained during the search of the vehicle, arguing that the deputy had unlawfully extended the scope and duration of the traffic stop without reasonable suspicion of criminal activity regarding Pylican's presence in the storage facility. The State objected, arguing that the deputy had reasonable suspicion of criminal activity regarding Pylican's presence in the storage facility. Further, the State contended that the outstanding warrant for Pylican's passenger would have inevitably extended the stop.

The district court granted Pylican's motion to suppress, ruling that the deputy had probable cause to detain Pylican for the purposes of the traffic violation, but did not have independent reasonable suspicion that criminal activity had occurred at the storage facility. Accordingly, the district court ruled that the deputy had unconstitutionally extended the duration of his justifiable seizure of Pylican by asking her about the storage facility. Alternatively, the district court concluded that the deputy unconstitutionally extended both the scope and duration of the stop when he ordered Pylican and her passenger to exit the vehicle. Further, the district court denied the State's contention that the passenger's warrant would have inevitably extended the duration of the stop beyond the initial traffic stop.[1] The State timely appealed. After the Idaho Court of Appeals affirmed the district court on appeal, the State filed a petition for review to this Court.

---

[1] On appeal, the State has not argued that the district court erred in rejecting the claim that the passenger's warrant would have inevitably extended the stop. Accordingly, the issue is waived. *State v. Garcia-Rodriguez*, 162 Idaho 271, 276, 396 P.3d 700, 705 (2017); *see also Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) (quotation omitted) ("We will not consider an issue not 'supported by argument and authority in the opening brief.'")

## II. STANDARD OF REVIEW

"When reviewing a case on petition for review from the Court of Appeals this Court gives due consideration to the decision reached by the Court of Appeals, but directly reviews the decision of the trial court." *State v. Jeske*, 164 Idaho 862, 867, 436 P.3d 683, 688 (2019) (quoting *State v. Schmierer*, 159 Idaho 768, 770, 367 P.3d 163, 165 (2016)).

This Court reviews a district court's order granting or denying a motion to suppress using a bifurcated standard of review. *State v. Cook*, 165 Idaho 305, 308, 444 P.3d 877, 880 (2019) (citation omitted). "This Court will accept the trial court's findings of fact unless they are clearly erroneous." *State v. Purdum*, 147 Idaho 206, 207, 207 P.3d 182, 183 (2009) (citing *State v. Diaz*, 144 Idaho 300, 302, 160 P.3d 739, 741 (2007), *overruled on other grounds by State v. Wulff*, 157 Idaho 416, 423, 337 P.3d 575, 582 (2014)). "However, this Court may freely review the trial court's application of constitutional principles in light of the facts found." *Id.* (citation omitted).

## III. ANALYSIS

The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV.[2] "Evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule, which requires unlawfully seized evidence to be excluded." *State v. Lee*, 162 Idaho 642, 647, 402 P.3d 1095, 1100 (2017) (citations omitted). "The exclusionary rule requires the suppression of both 'primary evidence obtained as a direct result of an illegal search or seizure, . . . but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." ' " *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

The protections of the Fourth Amendment extend to brief investigatory detentions that fall short of a formal arrest. *State v. Perez*, 164 Idaho 626, 628, 434 P.3d 801, 803 (2019) (quoting *State v. Bishop*, 146 Idaho 804, 811, 203 P.3d 1203, 1210 (2009)); *see also Terry v. Ohio*, 392 U.S. 1, 19 (1968). "Because a traffic stop is limited in scope and duration, it is analogous to an

---

[2] Defense counsel below asserted that the State violated Pylican's Fourth Amendment rights under the U.S. Constitution as well as her rights under Article I, Section 17 of the Idaho Constitution. However, no argument was made regarding the Idaho Constitution specifically. Further, on appeal, Pylican's counsel focused her arguments entirely on the Fourth Amendment. Any argument of a violation of the Idaho Constitution is waived, unless argued with specificity. *See Garcia-Rodriguez*, 162 Idaho at 275, 396 P.3d at 704 (quotations omitted) ("Issues not raised below will not be considered by this court on appeal, and the parties will be held to the theory upon which the case was presented to the lower court."). As a result, our analysis is limited to the U.S. Constitution.

investigative detention and is analyzed under the principles set forth in *Terry v. Ohio*[.]" *State v. Danney*, 153 Idaho 405, 409, 283 P.3d 722, 726 (2012) (citations omitted).

"An investigative detention 'must be temporary and last no longer than necessary to effectuate the purpose of the stop.' " *Id.* (quoting *State v. Henage*, 143 Idaho 655, 658, 152 P.3d 16, 19 (2007)); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983). When a person is detained, "[t]he scope of the detention must be carefully tailored to its underlying justification." *Royer*, 460 U.S. at 500.

> The stop remains a reasonable seizure while the officer diligently pursues the purpose of the stop, to which that reasonable suspicion is related. However, should the officer abandon the purpose of the stop, the officer no longer has that original reasonable suspicion supporting his actions. Indeed, when an officer abandons his or her original purpose, the officer has for all intents and purposes initiated a new seizure with a new purpose; one which requires its own reasonableness under the Fourth Amendment. This new seizure cannot piggy-back on the reasonableness of the original seizure. In other words, unless some new reasonable suspicion or probable cause arises to justify the seizure's new purpose, a seized party's Fourth Amendment rights are violated when the original purpose of the stop is abandoned (unless that abandonment falls within some established exception).

*State v. Linze*, 161 Idaho 605, 609, 389 P.3d 150, 154 (2016) (relying on *Rodriguez v. United States*, 575 U.S. 348, 357 (2015), and *United States v. Cortez*, 449 U.S. 411, 417 (1981)). The rule regarding the extension of the stop is "both broad and inflexible. It applies to all extensions of traffic stops including those that could reasonably be considered *de minimis*." *Id.* at 608, 389 P.3d at 153 (citation omitted).

Here, the deputy initiated a traffic stop when Pylican failed to use her turn signal. The district court properly concluded that the deputy had probable cause to detain Pylican based on that traffic violation. Neither party disputes this finding on appeal. The district court suppressed the evidence on two grounds: (1) the deputy lacked reasonable suspicion to question Pylican regarding her presence in the storage facility after hours, and (2) that the order for Pylican and her passenger to exit the vehicle unconstitutionally extended the stop. Each of these grounds will be discussed in turn.

### A. The deputy had reasonable suspicion to stop and question Pylican regarding her presence in the storage facility.

Under the Fourth Amendment, "[r]easonable suspicion must be based on specific, articulable facts and the rational inferences that can be drawn from those facts." *Perez*, 164 Idaho at 628, 434 P.3d at 803 (quoting *Bishop*, 146 Idaho at 811, 203 P.3d at 1210); *see also Terry*, 392

6

U.S. at 19. "The quantity and quality of information necessary to establish reasonable suspicion is less than that necessary to establish probable cause." *Gonzales*, 165 Idaho at 673, 450 P.3d at 321 (quoting *Bishop*, 146 Idaho at 811, 203 P.3d at 1210). "Still, reasonable suspicion requires more than a mere hunch or 'inchoate and unparticularized suspicion.' " *Id.* (quotation omitted); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Whether an officer possessed reasonable suspicion is evaluated based on the totality of the circumstances known to the officer at or before the time of the stop." *Gonzales*, 165 Idaho at 673, 450 P.3d at 321 (quotation omitted).

"Not every suspicious or abnormal behavior is sufficient to establish reasonable suspicion." *Id.* (citing *State v. Bly*, 159 Idaho 708, 711, 366 P.3d 193, 196 (Ct. App. 2016)). For example, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citation omitted). However, while conduct might be innocently explained, the Supreme Court of the United States has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.' " *Navarette v. California*, 572 U.S. 393, 403 (2014) (quoting *Arvizu*, 534 U.S. at 277). "Even so, innocent acts, when considered together, may be suspicious enough to justify an investigative detention if an officer points to articulable facts that the individual is engaged in criminal activity." *Gonzales*, 165 Idaho at 674, 450 P.3d at 322 (citations omitted).

The district court articulated the facts it relied upon in determining that the deputy did not have reasonable suspicion regarding criminal activity in the storage facility as follows:

> [The deputy] observed the vehicle enter a storage facility that has a gate. The gate can be operated by a code. There was a sign outside the storage facility that indicates its hours of operation are 8:00 a.m. to 10:00 p.m. and [the deputy] saw Ms. Pylican in her vehicle enter this facility. He couldn't quite see how that was accomplished, but he did see the gate coming down after her vehicle entered at a time that was about five minutes before midnight.
>
> He concluded that the vehicle was entering the storage unit after hours. He indicated that in his experience he has driven by this storage unit after 10:00 p.m. on multiple occasions and not observed any other vehicles in there after 10:00. He has also on at least one occasion . . . come in contact with people who were trying to access the storage facility after 10:00 p.m. who told him that they have codes because they are renters of units in that facility and that their codes would not cause the gate to operate after 10:00 p.m.
>
> . . . .

7

> [The deputy] did indicate that this . . . area . . . has had an unusually high number of calls initially. . . that . . . were theft related. Later on in his testimony he clarified that those were vehicle burglaries and residential thefts. . . .
>
> . . . .
>
> [The deputy] and other officers observe Ms. Pylican's vehicle parked inside the storage facility. They observe a second vehicle parked inside the storage facility. [The deputy] offered no testimony about how that second vehicle may have come to be in the storage facility or how long it had been there.

The district court noted that there was "no indication that [Pylican] broke into the facility or hopped over the fence or [jimmied the gate] in order to get it to work."

Here, accepting the district court's findings as true, we respectfully disagree with its legal conclusion that the deputy lacked reasonable suspicion to stop Pylican and question her regarding her presence in the storage facility. The following facts known to the deputy were found to be true by the district court: (1) the deputy observed Pylican enter the storage facility after its posted hours of operation and exit thirty-five minutes later; (2) the deputy had seen others try, and fail, to gain access to the storage facility after hours; and (3) the area in which the storage facility was located had recently experienced an "unusually high number of calls" regarding property crimes.. Additionally, once the deputy made a brief comment about observing her "in the storage facility after hours," Pylican volunteered that she had entered the storage facility prior to 10:00 p.m. At that point, the deputy was justified in further extending the stop because he had a reasonable basis to believe she was lying to him since he had observed her enter the facility much later.

It is important to acknowledge that although the deputy testified that he believed Pylican "lied" to him about being inside the storage facility before 10:00 p.m., the district court concluded that the deputy misunderstood Pylican's response. The district court found that Pylican's statement was likely referring to the fact that her husband, the driver of the other vehicle, had been inside the storage facility since before 10:00 p.m. The district court further found that "[h]e's the one who let her in." While we do not take issue with these findings, the deputy's belief that Pylican was lying was still a proper basis for his reasonable suspicion because reasonable suspicion must be based on the "circumstances known to the officer *at or before the time of the stop.*" *Gonzales*, 165 Idaho at 673, 450 P.3d at 321 (emphasis added) (quotations omitted). Because the standard for evaluating the basis for an officer's actions is an objective one, based on the facts known to the officer at the time, the deputy's determination in this case that Pylican had lied to him was objectively reasonable. *See State v. Perez-Jungo*, 156 Idaho 609, 614–15, 329 P.3d 391, 396–97

8

(Ct. App. 2014) ("[T]he length and scope of the initial investigatory detention may be lawfully expanded if there exist objective and specific articulable facts that justify reasonable suspicion that the detained person is, has been, or is about to engage in criminal activity.").

These facts, taken together, provided the deputy with more than a mere "hunch" that Pylican could be engaging in criminal activity within the storage unit, such as burglary or theft. Indeed, this was the result of an alert deputy carefully observing suspicious activity in an area he had patrolled "hundreds of times" before and knew to be associated with recent thefts. Accordingly, we hold that the deputy had reasonable suspicion to question Pylican about her presence in the storage facility. Consequently, we must now turn to whether the deputy's order to exit the vehicle impermissibly extended the stop.

**B.     The deputy did not impermissibly extend the duration of the stop by ordering Pylican to exit her vehicle.**

In granting Pylican's motion to suppress, the district court found that the deputy's order that Pylican and her passenger exit the vehicle unconstitutionally extended the duration and scope of what was otherwise a legal search. Relying on *Rodriguez*, 575 U.S. at 348, the district court stated that

> [i]t was clear from [the deputy's] testimony that the safety concern arose solely from [the deputies'] decision to undertake a drug investigation by walking the dog around the car. I do not believe that officers can decide to undertake an investigation for which they had no reasonable articulable suspicion and then use -- and then by doing so create a danger to themselves and then use that danger to justify extending the scope or the duration of a seizure.

On appeal, the State contends that the order to exit the vehicle did not violate the Fourth Amendment. Instead, the State argues that the district court reached its conclusion by misinterpreting *Rodriguez*. In response, Pylican argues that the district court correctly interpreted *Rodriguez* and that the order to exit the vehicle unconstitutionally extended the scope and duration of the traffic stop.

In *Pennsylvania v. Mimms*, the U.S. Supreme Court held, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." 434 U.S. 106, 111 (1977). The Court's underlying rationale was that the "government's 'legitimate and weighty' interest in officer safety outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Rodriguez*, 575 U.S. at 356

9

(quoting *Mimms*, 434 U.S. at 110–11). The Court reasoned that because the order to exit the vehicle was only a "*de minimis*" intrusion in relation to the stop as a whole, it would not rise to the level of a "petty indignity." *Id.* at 111 (quoting *Terry*, 392 U.S. at 17). Further, the interest in police officer safety was "both legitimate and weighty." *Id.* at 110. The Court recognized "the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Id.*

In *Rodriguez*, the Court narrowed the *Mimms* rule by holding "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." 575 U.S. at 355. There, the Court explained that a dog sniff is not an ordinary inquiry incident to a traffic stop; rather, "[a] dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.' " *Id.* (alteration in original). The Court further explained:

> Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself. Traffic stops are "especially fraught with danger to police officers," so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. On-scene investigation into other crimes, however, detours from that mission. So too do safety precautions taken in order to facilitate such detours. Thus, even assuming that the imposition here was no more intrusive than the exit order in *Mimms*, the dog sniff could not be justified on the same basis. Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.

*Id.* at 356–57 (internal citations omitted).

The district court relied on the above paragraph to hold that *Rodriguez* abrogated the holding in *Mimms*. However, *Rodriguez* does not bar officers from ordering occupants of a lawfully stopped vehicle to exit in order to investigate possible crimes unrelated to a valid traffic stop. *See id.* at 355. Instead, *Rodriguez* stands for the proposition that the underlying safety concerns which justify exit orders do not extend to general criminal investigations that are undertaken when the purpose of the lawful stop has been abandoned. *See id.* at 354. The holding in *Rodriguez* was limited to the facts of that case, the most salient being that the officer had *completed* the traffic stop by issuing Rodriguez a warning *and then ordered* Rodriguez out of his vehicle for a dog sniff to be performed without any reasonable suspicion of criminal activity related to drugs. *See id.* at 356–57. Thus, *Rodriguez* was not a wide-spread repudiation of *Mimms*; it was about the timing of the officer's actions.

10

This case is distinguishable from *Rodriguez*. Here, the deputy made a lawful traffic stop. Before he had checked any of Pylican's information, a K-9 officer arrived. After briefly speaking with the K-9 officer, but *before the traffic stop was completed*, the deputy ordered Pylican and the passenger to exit the vehicle. The K-9 officer conducted the dog sniff *while* the deputy checked Pylican's information and discussed her presence at the storage facility. Because the duration of the stop was not prolonged and the stop was otherwise lawful, the scope of the stop could be lawfully expanded to include "an unrelated check" without independent reasonable suspicion. *See Rodriguez*, 575 U.S. at 356.

In *Linze*, 161 Idaho 605, 389 P.3d 150, this Court considered a similar scenario to the case at bar. In that case, Linze was stopped for driving with a cracked front windshield. *Id.* at 606, 389 P.3d at 151. After initiating warrant checks for the driver and her passenger, the officer requested assistance from a K–9 Unit. *Id.* While the K–9 Unit was in transit, the officer continued his investigation. *Id.* When the K-9 Unit arrived, the officer left his patrol car and provided "cover" while the dog sniff took place. *Id.* at 607, 389 P.3d at 152. During a hearing on the defendant's motion to suppress, "[t]he State conceded that during those two and a half minutes, Officer Bridges had stopped pursuing the original purpose of the stop and was instead serving a 'backup function' to Deputy Moore." *Id.*

On appeal, this Court overturned the denial of the defendant's motion to suppress on the basis that the stop was impermissibly extended under *Rodriguez*: "[W]e hold that by delaying the traffic stop for two and a half minutes while performing a back-up function for a drug dog sweep, [the officer] violated the Fourth Amendment rights of [the driver and the passenger]." *Id.* at 609, 389 P.3d at 154. We explained our rationale as follows:

> The United States Supreme Court concluded [in *Rodriguez*] that "the critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" The United States Supreme Court's intention in *Rodriguez* is thus made clear. The rule isn't concerned with when the officer deviates from the original purpose of the traffic stop, it is concerned with the fact that the officer deviates from the original purpose of the stop at all.

*Id.* (citing *Rodriguez*, 575 U.S. at 361). Thus, this Court's concern in *Linze*—as was the concern of the U.S. Supreme Court in *Rodriguez*—centered around the *additional time* an extension of the stop by the officer would take, even if it was "de minimis." *Id.* at 609 n.2, 389 P.3d at 154 n.2. By so holding, we expressly recognized in *Linze* that it was the extra time required to complete the

11

dog sniff that offended the Fourth Amendment in *Rodriguez*. However, neither *Rodriguez* nor *Linze* apply to dog sniffs that do not extend the duration of the stop, as the *Linze* Court expressly noted:

> The United States Supreme Court [in *Rodriguez*] is careful to couch its opinion in the "*adds time to*" framework. It does this in order to allow for dog sniffs that do not add time to the stop (*i.e.*, dog sniffs in which one officer continues to pursue the original objectives of the stop while a second officer conducts a dog sniff).

161 Idaho at 609 n.1, 389 P.3d at 154 n.1 (emphasis added).

Thus, we agree with the dissent that the key question is "whether *conducting the sniff* 'prolongs' … 'the stop[.]' " *Id*. at 609, 389 P.3d at 154 (emphasis added). However, the stop in *Linze* is distinguishable from Pylican's stop because in this case the district court made no findings that *any* specific amount of time was added to the stop due to the officer's actions in permitting a dog sniff to take place while he simultaneously began his "investigation into the traffic offense." As *Linze* expressly allows, an officer may continue with the "original objectives of the stop while a second officer conducts a dog sniff." *Id*. Importantly, the findings on this point contained in the district court's oral ruling from the bench were as follows:

> I also find that [the deputy's] decision to ask – or command Ms. Pylican to exit the car extended the duration of the seizure. When Ms. Pylican is told that she has to get out of the car, it generates a conversation between Ms. Pylican and Deputy Geisel about why she's being asked to do so. There is some conversation between him and her about what she's permitted to do, can she use the phone. All of those things delay [the deputy] in beginning his investigation into the traffic offense. All of this occurs before he starts radioing in Ms. Pylican's name and the passenger's name to check on her driver's status and to check for wants and warrants.

This finding demonstrates that any extension to the duration of the stop in this case was not a result of the dog sniff itself; rather, the extension was caused by Pylican questioning the order to exit the vehicle and whether she could use a phone. While it is not clear from the record or the district court's findings how much time actually elapsed due to Pylican's questioning of the officer, it is clear that it was Pylican who extended the duration of the stop.

It should be axiomatic that a defendant cannot claim that a stop was unconstitutionally prolonged *by the State* when any delay was a consequence of her own conduct. Yet, the dissent argues that "[i]f not for the deputy's order to exit the vehicle, Pylican would not have asked any questions about the exit order." However, such an analysis could result in almost any questioning of an order from law enforcement—even a lawful order—being deemed an unlawful extension of the stop. Ultimately, it is the lawfulness of the request that is determinative, not the time spent

12

arguing about it. Here, the request for Pylican to step out of the vehicle was clearly lawful. *Mimms*, 434 U.S. at 110–11. Accordingly, we conclude that the deputy's exit order did not violate Pylican's Fourth Amendment right against unreasonable searches and seizures.

## IV. CONCLUSION

For the foregoing reasons, we reverse the district court's order granting Pylican's motion to suppress, and remand the case for further proceedings.

Chief Justice BURDICK and Justice BEVAN **CONCUR.**


STEGNER, J., dissenting.

I respectfully dissent. I believe that the deputy unconstitutionally extended the stop by ordering Pylican and her passenger to exit the vehicle. As a result, the district court properly suppressed the evidence obtained after the stop was extended.

In granting Pylican's motion to suppress, the district court found that the deputy's order that Pylican and her passenger exit the vehicle unconstitutionally extended the duration and scope of what was otherwise a legal search. Relying on *Rodriguez v. United States*, 575 U.S. 348 (2015), the district court stated that

> [i]t was clear from [the deputy's] testimony that the safety concern arose solely from [the deputies'] decision to undertake a drug investigation by walking the dog around the car. I do not believe that officers can decide to undertake an investigation for which they had no reasonable articulable suspicion and then use -- and then by doing so create a danger to themselves and then use that danger to justify extending the scope or the duration of a seizure.

In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), the U.S. Supreme Court held, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id.* at 111 n.6. That Court reasoned that it was only a "*de minimis*" incremental intrusion to require a driver who was already seized to exit the vehicle, and would not rise to the level of a "petty indignity." *Id.* at 111 (quoting *Terry*, 392 U.S. at 17). Further, the interest in police officer safety was "both legitimate and weighty." *Id.* at 110. The Court recognized "the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Id.*

However, the U.S. Supreme Court in *Rodriguez* cast doubt on the blanket holding in *Mimms*. In *Rodriguez*, the U.S. Supreme Court analyzed whether a police officer impermissibly

13

extended a traffic stop by waiting for backup in order to run a drug-detection dog around the vehicle. *Rodriguez*, 575 U.S. at 350. The Court stated,

> [u]nlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself. Traffic stops are "especially fraught with danger to police officers," so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. *On-scene investigation into other crimes, however, detours from that mission. So too do safety precautions taken in order to facilitate such detours.* Thus, even assuming that the imposition here was no more intrusive than the exit order in *Mimms*, the dog sniff could not be justified on the same basis. Highway and officer safety are interests different in kind from the [g]overnment's endeavor to detect crime in general or drug trafficking in particular.

*Id.* at 356–57 (italics added) (internal citations omitted). Here, the district court relied on the italicized language above to conclude that an extension of the stop to facilitate safety precautions not based on the traffic stop itself, but based on the use of a drug dog, was an unconstitutional extension of the stop.

The *Rodriguez* Court created a new standard to review a deputy's order to exit a vehicle. Pursuant to *Rodriguez*, a district court would be empowered to review the reasons for the officer's safety concerns leading to an order to exit. This review allows the district court to determine the reasonableness of the officer's actions based on the totality of the circumstances known to the officer at the time. The standard set forth in *Rodriguez* aligns with the ultimate touchstone of Fourth Amendment jurisprudence, which is "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 398 (2006). *Rodriguez* modified the *per se* rule articulated in *Mimms*. Under this modified approach, an exit order would only be reasonable under *Mimms*, if the order were based on the inherent safety concerns associated with a traffic stop. However, if the purpose of the stop were for some reason other than a traffic stop, such as drug enforcement, the officer would need reasonable suspicion in order to extend the stop to facilitate that purpose, including ordering a driver or passenger to exit the vehicle.

In this case, the purpose of the stop was to address a traffic violation and to investigate Pylican's presence in the storage facility; the purpose of the stop was not to conduct a drug investigation. Reasonable suspicion must be based on the "circumstances known to the officer at or before the time of the stop." *State v. Gonzales*, 165 Idaho 667, 673, 450 P.3d 315, 321 (2019) (italics added) (quotation omitted). The deputy did not articulate any suspicion that Pylican possessed drugs. There was no suggestion that, at the time the deputy stopped Pylican, he believed

14

that he was engaging in a drug investigation. Rather, the deputy's suspicion had been that Pylican was engaging in theft. The deputy testified at the suppression hearing that he asked Pylican and her passenger to exit the vehicle as a safety precaution *for the K–9 officer* as he walked the dog around the vehicle. He stated that a safety concern arises while the officer is focusing on the drug dog because he will not be focusing on the occupants, reasoning that this lack of focus presents a danger of either weapons being drawn or evidence being concealed or destroyed. However, here the "safety" concern meriting the exit order was not associated with the traffic stop or related to the officer's suspicion of theft. Instead, the safety concern was associated with the use of a drug dog *itself* for drug enforcement, for which there was no reasonable suspicion. As the safety precaution was not to promote the mission of the traffic stop but to ostensibly protect the officer conducting the K–9 search without reasonable suspicion, the order to exit the vehicle was an unconstitutional extension of the traffic stop.

The majority opinion relies on the fact that the officer had not yet completed the traffic stop to distinguish this case from *Rodriguez*. The majority states that because the deputy ordered Pylican and her passenger to exit the vehicle before the traffic stop was completed, and because the K–9 search took place *while* the deputy continued the traffic stop, the stop was not impermissibly extended. However, this conclusion fails to appreciate that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *State v. Linze*, 161 Idaho 605, 608, 389 P.3d 150, 153 (2016) (quotation omitted). "This rule is both broad and inflexible." *Id.*

This Court addressed a similar question in *Linze*. In *Linze*, this Court held that "delaying the traffic stop for two and a half minutes while performing a back-up function for a drug dog sweep" violated the defendant's Fourth Amendment rights. *Id.* at 609, 389 P.3d at 154. As we noted in *Linze*, "the critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket ... but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop[.]'" *Id.*

Accordingly, based on this Court's decision in *Linze*, we must look for any time that was added to the stop that was outside the scope of the stop. The deputy temporarily abandoned the purpose of the stop to order Pylican to exit the vehicle for a K–9 search. It is axiomatic that the time to complete the stop was extended by the time it took for the deputy to order Pylican from her vehicle and escort her to the area near the front of the deputy's vehicle. During this time, the

15

deputy had abandoned both purposes of the stop, i.e., the traffic stop and Pylican's presence in the storage facility. While I recognize that the period of time in which the deputy abandoned the purposes of the stop was minimal, the standard recognized in both *Rodriguez* and *Linze* is inflexible. *Any* amount of time in which the purpose of the stop is abandoned for "[o]n-scene investigation into other crimes" impermissibly extends the time needed to complete the original purpose of the stop, however otherwise valid. *See Rodriguez*, 575 U.S. at 356.

Further, I respectfully disagree with the majority's contention that *Pylican herself* caused the stop to be extended. Rather, it was the deputy's actions that caused the conversation between the deputy and Pylican. As the district court noted that when Pylican is ordered to get out of the car, "it generates a conversation between Ms. Pylican and [the deputy] about why she's being asked to do so. . . . All of those things delay [the deputy] in beginning his investigation into the traffic offense." If not for the deputy's order to exit the vehicle, Pylican would not have asked any questions about the exit order.

Accordingly, the district court did not err in its alternative ruling that the order to exit impermissibly extended the scope and duration of the traffic stop. Consequently, I would affirm the district court's order granting Pylican's motion to suppress.

Justice BRODY concurs.