**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 48295**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, January 2022 Term |
| | ) | |
| v. | ) | Opinion Filed: July 19, 2022 |
| | ) | |
| BRIAN JAMES HOLLIST, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bonneville County. Dane H. Watkins, District Judge.

The decision of the district court is <u>reversed</u>.

Eric D. Fredericksen, State Appellate Public Defender, Boise, for appellant, Brian James Hollist. Jacob L. Westerfield argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent State of Idaho. Justin R. Porter argued.

_____

STEGNER, Justice.

The case involves an appeal by Brian Hollist challenging a district court's denial of his motion to suppress. Hollist was arrested in Idaho Falls after an officer approached him while he was sleeping on a canal bank. Prior to Hollist's arrest, the officer was responding to check on his welfare. Upon the officer's arrival, he asked if Hollist needed medical assistance, to which Hollist responded that he did not. At this point, the officer contacted medical personnel who were advised they did not need to come to Hollist's aid. After advising the officer he did not need medical assistance, Hollist attempted to leave several times; however, each time the officer insisted that Hollist remain. When Hollist declined to identify himself, the officer handcuffed him and ordered him to sit down on the grass. The officer later discovered that Hollist had an outstanding warrant for his arrest. Following his arrest, officers found a glass pipe with white residue and a bag with a small amount of methamphetamine inside.

1

Before trial, Hollist moved to suppress the methamphetamine and pipe, arguing that the officer was not performing a community caretaking function at the time he was detained. He also maintained the officer did not have reasonable suspicion to detain him. Finally, Hollist argued that the eventual discovery of the arrest warrant did not purge the taint of his unlawful seizure. The district court denied Hollist's motion to suppress. Hollist timely appealed. For the reasons that follow, we reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the morning of August 3, 2019, Officer Erik Okopny[1] responded to a call for a welfare check for a man lying near an irrigation canal who was either asleep or unconscious. As Okopny approached the man, later identified as Hollist, Hollist awoke. Okopny asked Hollist if he needed medical assistance. Hollist informed Okopny that he did not need medical assistance and then attempted to leave several times.[2] Okopny insisted multiple times that Hollist identify himself, which Hollist declined to do. After Hollist refused to identify himself and tried to depart on a child's bicycle, which appeared to be among Hollist's belongings, Okopny placed him in handcuffs, made him sit down on some nearby grass, and informed him that he was "being detained." While in handcuffs, Hollist eventually identified himself and police discovered an outstanding warrant for his arrest. Upon formally arresting Hollist, another officer who had arrived at the scene began to search Hollist's belongings. In doing so, he discovered a glass pipe with burnt white residue inside. When Okopny searched Hollist's person, he discovered a small bag containing a substance that later tested positive for methamphetamine.

Hollist was subsequently charged by a criminal complaint with possession of a controlled substance and possession of drug paraphernalia. A preliminary hearing took place, at which only Okopny testified. The magistrate court found probable cause for Hollist to be formally charged and bound the case over to district court. The State filed an Information reflecting the same two charges.

In district court, Hollist filed a motion to suppress the methamphetamine and paraphernalia, arguing that he had been unlawfully seized without reasonable suspicion. Specifically, Hollist argued that the community caretaking function did not apply because he told Okopny that he was

---

[1] The transcript contains references to an "Erik Okotny;" however, this appears to be a typographical error.

[2] The entirety of Okopny's interaction with Hollist, which lasted approximately twenty minutes, was recorded by Okopny's on-body camera.

not in need of medical attention and Okopny had called off medical personnel from responding. Hollist also maintained Okopny did not have reasonable suspicion to detain him. Finally, Hollist contended that Okopny's unlawful seizure of him was not sufficiently attenuated from Okopny locating contraband on Hollist.

The State opposed Hollist's motion, arguing that Okopny was originally performing a community caretaking function, and later developed reasonable suspicion that Hollist was intoxicated in public. The State alternatively argued that even if Okopny had unlawfully seized Hollist, the evidence was sufficiently attenuated from the unlawful seizure that it should not be suppressed. At the hearing on Hollist's motion to suppress, the district court concluded that Okopny was engaged in a community caretaking function even after informing dispatch that no medical assistance was needed. The district court further concluded that Okopny had reasonable suspicion that Hollist was under the influence of alcohol or drugs in public. Consequently, the district court denied Hollist's motion.

Hollist reached a plea agreement with the State where the State agreed to dismiss the paraphernalia charge in exchange for Hollist pleading guilty to the possession charge, reserving his right to appeal the district court's denial of his motion to suppress. The district court accepted the plea and sentenced Hollist to a unified term of incarceration of four years, with two years fixed. The district court then suspended the sentence and placed Hollist on supervised probation for four years. Hollist timely appealed.

## II.     STANDARD OF REVIEW

"When this Court reviews a district court's order granting or denying a motion to suppress, the standard of review is bifurcated." *State v. Gonzales*, 165 Idaho 667, 671, 450 P.3d 315, 319 (2019) (quoting *State v. Purdum*, 147 Idaho 206, 207, 207 P.3d 182, 183 (2009)). "This Court will accept the trial court's findings of fact unless they are clearly erroneous." *Id.* (citing *State v. Watts*, 142 Idaho 230, 232, 127 P.3d 133, 135 (2005)). Even so, "this Court may freely review the trial court's application of constitutional principles in light of the facts found." *Id.* (citing *State v. Diaz*, 144 Idaho 300, 302, 160 P.3d 739, 741 (2007)).

*State v. Amstutz*, 169 Idaho 144, 146, 492 P.3d 1103, 1105 (2021). "Determinations of reasonable suspicion are reviewed *de novo*." *State v. Bonner*, 167 Idaho 88, 93, 467 P.3d 452, 457 (2020) (quoting *State v. Morgan*, 154 Idaho 109, 111, 294 P.3d 1121, 1123 (2013)).

III.   ANALYSIS

"Warrantless searches and seizures are presumptively unreasonable under the Fourth Amendment." *State v. Rios*, 160 Idaho 262, 265, 371 P.3d 316, 319 (2016) (quoting *State v. Wulff*, 157 Idaho 416, 418, 337 P.3d 575, 577 (2014)).

> "When the defendant challenges the legality of a search based upon the absence of a search warrant, the burden then shifts to the State to prove the legality of the search." [*State v. Holland*, 135 Idaho 159, 162, 15 P.3d 1167, 1170 (2000)] (citation omitted). Once the burden has shifted, the State must "demonstrate that the search either fell within a well-recognized exception to the warrant requirement or was otherwise reasonable under the circumstances." *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995).

*State v. Hoskins*, 165 Idaho 217, 221, 443 P.3d 231, 235 (2019). "Evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule, which requires unlawfully seized evidence to be excluded from trial." *State v. Cohagan*, 162 Idaho 717, 720, 404 P.3d 659, 662 (2017). "When a defendant seeks to suppress evidence allegedly obtained as a result of an illegal seizure, the burden of proving that a seizure occurred is on the defendant." *State v. Page*, 140 Idaho 841, 843, 103 P.3d 454, 456 (2004) (quoting *State v. Reese*, 132 Idaho 652, 654, 978 P.2d 212, 214 (1999)).

### A. Officer Okopny was not performing a "community caretaking" function when he seized Hollist.

Hollist first argues that Okopny was not performing a community caretaking function when he unlawfully seized Hollist. Hollist asserts that even if Okopny was performing that function, it ended as soon as Okopny "called off oncoming medical personnel." "Okopny made no further inquiry about Mr. Hollist's health during the encounter after telling Mr. Hollist that he needed to talk to him to make sure he was alright." Hollist points to the incongruity between Okopny's initial report, which stated Okopny's basis for seizing Hollist was to require him to identify himself, and Okopny's statements at the preliminary hearing, where Okopny changed course and claimed to be more focused on Hollist's health and any potential previous medical emergencies.

Citing *State v. Cutler*, 143 Idaho 297, 302, 141 P.3d 1166, 1171 (Ct. App. 2006) and *State v. Jay*, 167 Idaho 592, 599, 473 P.3d 861, 868 (Ct. App. 2020), the State responds that the community caretaking exception applied, and Okopny's "genuine and warranted concern that Hollist needed assistance was reasonable, given the totality of the circumstances."

"The community caretaker function arises from the duty of police officers to help citizens in need of assistance." *Page*, 140 Idaho at 844, 103 P.3d at 457.

4

In analyzing community caretaking function cases, Idaho courts have adopted a totality of the circumstances test. [*Matter of Clayton*, 113 Idaho 817, 818–19, 748 P.2d 401, 402–03 (1988)]. "[T]he constitutional standard is whether the intrusive action of the police was reasonable in view of all the surrounding circumstances." *State v. Waldie*, 126 Idaho 864, 867, 893 P.2d 811, 814 (Ct. App. 1995).

*State v. Wixom*, 130 Idaho 752, 754, 947 P.2d 1000, 1002 (1997). "There must also be some genuine and warranted concern by the officer to justify the detention of a citizen and not simply the officer's curiosity or an unsubstantiated suspicion of criminal activity." *Page*, 140 Idaho at 844, 103 P.3d at 457. As previously noted, it is the State's burden to prove an exception to the warrant requirement applies.

In *Page*, an officer saw a man walking late at night carrying several bags. *Id.* at 842, 103 P.3d at 455. The officer approached the man and asked if he needed any assistance, to which the man responded he did not. *Id.* The officer then requested the man's driver's license and eventually discovered an outstanding warrant. *Id.* On appeal, this Court noted that although police may request identification from *drivers*, "[n]o equally compelling policy or statutory authority can be cited in the case of seizing a license from a *pedestrian*." *Id.* at 845, 103 P.3d at 458 (italics added). The Court then concluded that "the totality of the circumstances presented to [the officer] showed no compelling need to seize the identification and conduct a warrants check; nor were there facts present that legitimized the detention of Page once the officer determined, pursuant to his community caretaker function, that Page was not in need of assistance." *Id.*

In this case, it can reasonably be said that Okopny was performing a community caretaking function up until the point when he determined that Hollist was not in need of any medical assistance. (The point at which Okopny called off the medical personnel happened almost immediately upon Okopny's arrival.) It was reasonable for Okopny to be concerned about a potentially unconscious person lying so close to a canal. However, after Okopny verified with Hollist that he did not need medical assistance and Okopny then informed medical assistance that it need not respond to the scene, Okopny was no longer justified in his conduct because of the community caretaking function. Nevertheless, Okopny persisted in requiring that Hollist identify himself because his "lieutenants wanted to know who he was speaking with." The facts in *Page* are indistinguishable from the facts in Hollist's case.

Hollist was merely a pedestrian, which defeated any reason for Okopny to secure Hollist's driver's license or identification. *See Page*, 140 Idaho at 844, 103 P.3d at 457. Okopny asked Hollist whether he had any warrants, demonstrating that he merely had an unsupported suspicion

not based on any specific or articulable facts. Okopny wrote in his police report, "I detained Hollist for failing to identify himself." Okopny's after-the-fact explanation that he was concerned Hollist was under the influence of alcohol or drugs does not comport with Okopny's report or his body camera footage, which clearly shows Hollist insisting that he did not need medical attention, attempting to leave, and Okopny's repeated insistence that Hollist remain and identify himself. The need to ensure Hollist's safety dissipated when Hollist said he was fine, demonstrated his ability to stand and walk, and stated he did not need medical attention. Okopny also clearly believed medical assistance was not required when he used his radio to inform any responding medical providers that there was no emergency medical situation. Okopny continued to detain Hollist on no basis other than his "curiosity or an unsubstantiated suspicion of criminal activity." *See Page*, 140 Idaho at 844, 103 P.3d at 457. Consequently, we hold that the State has failed to establish that Okopny was performing a community caretaking function when he seized Hollist for refusing to identify himself.

**B. Officer Okopny did not have reasonable suspicion to detain Hollist.**

Hollist next argues that Okopny seized him without having any reasonable suspicion that he was engaged in, or about to engage in, criminal activity. Specifically, Hollist contends that he was seized "after [Okopny] call[ed] off medical personnel [and] commanded Mr. Hollist to stay in the area multiple times." In the alternative, Hollist asserts that he was seized, at the latest, when Okopny placed him in handcuffs. Hollist notes that in Okopny's initial written report, Okopny stated that he detained Hollist for failing to identify himself, yet, at the preliminary hearing, Okopny changed his rationale and claimed that he believed Hollist was under the influence of drugs in public. Hollist asserts that there was no evidence of intoxication, nor was there evidence that Hollist could not legally be near the canal bank.

Hollist contends that the body camera footage does not support the State's argument, nor does it support the district court's conclusion that he was stumbling around or rambling throughout his conversation with Okopny. Under the totality of the circumstances, Hollist argues, Okopny did not have reasonable suspicion that Hollist was publicly intoxicated. Nor did Okopny have reasonable suspicion that Hollist had an outstanding warrant: "[i]t would be unreasonable to allow an officer to detain and handcuff people merely because they tell the officer that they do not know whether they have an outstanding warrant for their arrest."

6

In response, the State concedes that Hollist was seized when Okopny placed him in handcuffs yet contends that the seizure was supported by the officer's community caretaking function. The State next argues that, at the time Hollist was seized, "Okopny had reasonable suspicion that Hollist was under the influence of a controlled substance in public." The State speculates that Hollist's "reluctance to receive medical attention could reasonably be because he knew he was under the influence of a controlled substance and did not want that fact discovered."

> Under the Fourth Amendment of the United States Constitution, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. "The Fourth Amendment's reasonableness requirement has been held to apply to brief investigatory detentions." *State v. Bishop*, 146 Idaho 804, 811, 203 P.3d 1203, 1210 (2009) (citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

*State v. Gonzales*, 165 Idaho 667, 673, 450 P.3d 315, 321 (2019) (alteration in original).

"The test to determine if an individual is seized for Fourth Amendment purposes is an objective one[.]" *State v. Henage*, 143 Idaho 655, 658, 152 P.3d 16, 19 (2007).

> "When a defendant seeks to suppress evidence allegedly obtained as a result of an illegal seizure, the burden of proving that a seizure occurred is on the defendant." [*Page*, 140 Idaho at 843, 103 P.3d at 456] (quoting *State v. Reese*, 132 Idaho 652, 654, 978 P.2d 212, 214 (1999)). "*Therefore, the proper inquiry in determining whether a seizure occurred is whether, under all the circumstances surrounding an encounter, a reasonable person would have felt free to leave or otherwise decline the officer's requests and terminate the encounter.*" *Id.* (internal citation omitted). This rule has been otherwise stated as "'[s]o long as a reasonable person would feel free to disregard the police and go about his business,' an encounter between police and an individual is consensual." *Id.* at 843–44, 103 P.3d at 456–57 (quoting [*State v. Nickel*, 134 Idaho 610, 613, 7 P.3d 219, 222 (2000)]).

*State v. Alvarenga-Lopez*, 169 Idaho 215, 494 P.3d 763, 766 (2021) (italics added).

Hollist was clearly seized when Okopny placed him in handcuffs. Because the State concedes as much, there is no real dispute in that regard. However, Hollist was not free to leave *well before* that point. Hollist attempted to leave at multiple points during the encounter, stating "I need to be on my way" and "dude, I gotta go" and "dude, I don't want to stay here." Okopny repeatedly commanded Hollist to "hold on, man," "why don't you come over here real [sic] quick," "stay here," "my lieutenants want to know who I'm talking to," and "hold on right here." Given these multiple entreaties by Okopny, a reasonable person would not have felt free to leave and terminate the encounter with Okopny *prior to* being placed in handcuffs. Hollist attempted to terminate his encounter with Okopny multiple times and was repeatedly prevented from doing so.

Because Hollist was seized before he was handcuffed, we must next determine whether Okopny's seizure of Hollist was supported by reasonable suspicion. "Whether an officer possessed reasonable suspicion is evaluated based on the totality of the circumstances known to the officer at or before the time of the stop." *Id.* (quoting *Bishop*, 146 Idaho at 811, 203 P.3d at 1210). Reasonable suspicion must be based on specific, articulable facts and *rational* inferences that can be drawn from those facts. *State v. Pylican*, 167 Idaho 745, 751, 477 P.3d 180, 186 (2020). "In determining whether an officer has reasonable suspicion, 'due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" *State v. Bonner*, 167 Idaho 88, 94, 467 P.3d 452, 458 (2020) (quoting *Terry*, 392 U.S. at 27). The burden of establishing reasonable suspicion lies with the State. *Hoskins*, 165 Idaho at 221, 443 P.3d at 235.

Here, Okopny's body camera footage is telling. While the district court gave one description of what occurred (quoted at length by the dissent), suffice to say we disagree with that description. Okopny's on-body camera recorded his entire interaction with Hollist. As Okopny approaches Hollist, who was lying down[3] on the canal bank, Hollist is obviously startled awake and immediately gets up and begins to gather his belongings and leave the area. Hollist stated he was alright and did not need medical attention. Okopny called off the ambulance as Hollist walked toward a child's bicycle lying on the ground and stated "I need to be on my way," which prompted Okopny to state, "hold on man, you got an ID on you? My lieutenants want to know who I am talking to." It is at this point that Okopny detains Hollist as Hollist is required to remain with Okopny until he, Hollist, identifies himself.

Hollist, while turned away from Okopny, stated he did not have any identification on him. Okopny then orders Hollist to come to where Okopny is. Hollist asked "why?" Okopny stated "because I need to talk to ya [sic]." Hollist asked what Okopny needed to talk to him about and Okopny responded that he needed to make sure Hollist was alright. Hollist again stated he was alright. Okopny then told Hollist "I need to know who I'm talking to." Hollist then stated "dude, I gotta go, okay." Okopny again told Hollist to "hold on man" as Hollist walked away with the bicycle. Okopny told Hollist to "stay here" and Hollist responded that he did not want to stay there.

---

[3] The dissent contends that Hollist was lying "face down" on the canal bank. The body camera footage, however, depicts Hollist laying on his side.

Okopny stated that medical was not coming, he wanted to talk to Hollist "for a second" and asked Hollist to put the bicycle and his tablet down.

Okopny then asked Hollist if he had any outstanding warrants. Hollist responded, "my ex-wife – I don't know. My ex-wife is kind of a bitch, and she had some issues, and I don't know." Okopny responded, "Well let me figure it out for you, man." Immediately after this statement, Hollist attempted to mount his bicycle, but before he could, Okopny handcuffed Hollist for "trying to run from [him.]" It does not appear to be a fair characterization of events to say Hollist was "trying to run from [him]." Less than one minute elapsed between Okopny approaching Hollist and Okopny placing Hollist in handcuffs. After he handcuffed Hollist, Okopny asked Hollist "you probably have a warrant, is that why you're trying to run from me, man?" Hollist replied, "maybe, I don't know." Okopny sat Hollist down on the grass and asked him for his name. Hollist stated his name and spelled his first name. Okopny asked Hollist to spell his last name. Hollist hesitated and asked why he was being detained. Okopny stated it was because he asked Hollist his name and Hollist tried to walk away. Hollist then stated that he did not legally have to give Okopny his name. Okopny responded that Hollist tried to run from Okopny, and Hollist said he did not try to run, but tried to walk away. Okopny stated "right, because you're afraid you have warrants, so right now you need to identify yourself." They then argued further about whether Hollist was trying to flee and whether he needed to identify himself. Hollist eventually stated his last name and Okopny asked Hollist to spell it. When Hollist hesitated, Okopny stated "so if you fail to identify man, there's another charge for you." Hollist then spelled his last name. After the encounter, Okopny filed a police report which stated, "I detained Hollist for failing to identify himself," and "I detained Hollist due to him constantly wanting to walk away from me and refusing to identify himself." Nothing in Okopny's written report reflected a belief that Hollist was intoxicated or that he was suspected of breaking any law.

However, at the preliminary hearing, Okopny's testimony changed substantially and materially differed from his written report and the body camera footage. Okopny testified that he detained Hollist "to make sure he was doing okay still and was okay to – to leave because I didn't want him to go fall into the canal bank or go up to homes and get ran [sic] over by a car because I wasn't sure what his mental state was at that time." On cross-examination, Okopny speculated that he "was trying to ID [Hollist] to figure out if we had any previous calls for any medical emergencies that he has. I don't know if he's diabetic or anything like that, maybe in diabetic

shock." Okopny then pivoted from his written report and his earlier testimony regarding his concern for Hollist's welfare in that he thought Hollist was under the influence of drugs because, "[u]sually, people that are on meth, they're very antsy. They can't sit still. They constantly want to keep moving." In juxtaposition with this testimony is the fact that when Okopny came upon Hollist he was apparently sleeping, the opposite of being "antsy." Later, Okopny testified, "I was worried that – for his safety as well as others that may be involved of what could come later, was my issues [sic], as well as possibly him littering on the ground there and him being high in public was my concern." Okopny's post hoc rationale is belied by his call to medical personnel shortly after his arrival, advising them they did not need to come and check on Hollist's condition. The rationale is also belied by his written report, in which he stated that he detained Hollist for failing to identify himself and the body camera footage, which demonstrates Okopny's repeated insistence that Hollist may have warrants and needed to identify himself.

Simply put, Okopny did not have reasonable suspicion to detain Hollist. Okopny struggled to articulate specific facts that gave rise to a reasonable suspicion that Hollist was publicly intoxicated or engaged in any other criminal activity. Further, the body camera footage contradicts this conclusion. Instead, Okopny presented several reasons for detaining Hollist, including that he might have been littering (not that he was), in diabetic shock (even though there's no suggestion from the body camera that Hollist was in diabetic shock), or that he was under the influence of drugs in public. Okopny never asked Hollist if he had recently used drugs or alcohol during the encounter but instead focused exclusively on demanding Hollist identify himself and stating the belief that Hollist may have warrants.

The body camera footage from Okopny's on-body camera and his written report do not support Okopny's preliminary hearing testimony. While it may be unusual for someone to be lying on a canal bank on a sunny summer morning, there was no argument that Hollist was unlawfully present on the canal bank. Further, it is clear from the body camera footage that Okopny's primary goal after quickly concluding that Hollist did not need medical attention, was to compel Hollist to remain and identify himself and so that the officer could check for outstanding warrants. Although a situation may arise where emergency medical assistance is not necessary, but an officer still has concerns about a suspect's ability to get home on their own, this was not that situation. Okopny admittedly stated that he wanted to ensure Hollist was "alright" before letting him leave, but his focus, as confirmed by his written report, was to force Hollist to identify himself to conduct a

criminal records check. It appears that Okopny mistakenly believed that Hollist was legally required to identify himself. After Hollist is placed in handcuffs, Okopny told Hollist, "If you fail to identify, there's another charge for you." Another officer who arrived later, also mistakenly told Hollist that the law allows an officer to detain an individual until he identifies himself.

We also note that this Court's case law does not support Okopny's written rationale for seizing Hollist. *See Page*, 140 Idaho at 845, 103 P.3d at 458. In *Page*, we concluded that no "compelling policy or statutory authority" exists for securing identification from a pedestrian. *Id.* "Twenty-five years ago the United States Supreme Court made clear the general rule that in the absence of any basis for suspecting an individual of misconduct, the Fourth Amendment generally does not allow government agents to detain an individual and demand identification." *Id.* (citing *Brown v. Texas*, 443 U.S. 47, 99 (1979), which held that a Texas statute requiring pedestrian to identify himself to law enforcement violated the Fourth Amendment because it lacked a requirement that officers have reasonable suspicion that the suspect had engaged or was engaged in criminal activity prior to seeking identification). Importantly, according to Okopny's body camera footage and police report, Okopny's focus prior to seizing Hollist was on having Hollist identify himself. For these reasons, the State has failed to meet its burden establishing that Okopny had reasonable, articulable suspicion to support his seizure of Hollist.

### C. Officer Okopny's unlawful seizure of Hollist was not sufficiently attenuated from the discovery of contraband.

Finally, Hollist asserts that the discovery of his outstanding warrant did not "purge the taint of the unlawful seizure," and the contraband subsequently located by police should be suppressed. There are three factors associated with the attenuation doctrine:

> "There are three factors for a court to consider when determining whether unlawful conduct has been adequately attenuated." Those factors are: "(1) the elapsed time between the misconduct and the acquisition of the evidence, (2) the occurrence of intervening circumstances, and (3) the flagrancy and purpose of the improper law enforcement action."

*Cohagan*, 162 Idaho at 721–22, 404 P.3d at 663–64 (internal citations omitted).

Hollist asserts that the first factor weighs in favor of suppression because only minutes elapsed between the unlawful seizure and the discovery of the warrant. Hollist next concedes that the second factor weighs in favor of the State because the discovery of an arrest warrant is an intervening circumstance that "strongly favors the State." *Id.* at 722, 404 P.3d at 664. Finally, Hollist contends that the third factor favors suppression because Okopny "engaged in an

11

unjustified, suspicionless seizure of Mr. Hollist simply because Mr. Hollist would not give Officer Okopny his identification information or name."

In response, the State concedes that the first factor favors suppression because "the time between the allegedly illegal seizure and the discovery of the paraphernalia and methamphetamine was only a few minutes." Next, the State contends that the second factor "weighs heavily against suppression." Finally, the State argues that the third factor weighs against suppression as well because, "at most, Officer Okopny's conduct was negligent" as opposed to "flagrant."

The attenuation doctrine, which is an exception to the exclusionary rule "allows evidence to be admitted 'when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."'" *Cohagan*, 162 Idaho at 721, 404 P.3d at 663 (quoting *Utah v. Strieff*, 579 U.S. 232, 238 (2016)).

As a preliminary matter, this Court in *Cohagan* discussed United States Supreme Court case, *Utah v. Strieff*, 579 U.S. at 232, which in turn discussed the attenuation doctrine at length. In *Cohagan*, this Court mistakenly attributed to *Strieff* the proposition that the first factor, elapsed time, "*favors attenuation* unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." *Cohagan*, 162 Idaho at 722, 404 P.3d at 664 (quoting *Strieff*, 579 U.S. at 239) (italics added). The entirety of the sentence quoted from *Strieff* provided: "Our precedents have declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." *Strieff*, 579 U.S. at 239 (quoting *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)).

While the words quoted from *Strieff* in *Cohagan* are technically a correct quotation, the quoted phrase was mistakenly taken out of context. We correct this error today by clarifying that the closeness in time between an unlawful seizure and discovery of evidence favors *suppression* of that evidence. Attenuation, on the other hand, arises when substantial time has elapsed between the unlawful seizure and the discovery of evidence. *See Strieff*, 579 U.S. at 239; *see also Cohagan*, 162 Idaho at 722, 404 P.3d at 664. In other words, the closer in time between the unlawful conduct and the discovery of evidence the more likely the evidence is to be suppressed, unlike attenuation which is more likely to be found if a substantial amount of time passes between the unlawful conduct and eventual discovery of evidence. Both *Cohagan* and *Strieff* support this rationale;

12

however, the *Cohagan* decision mistakenly quoted only a portion of the relevant language from *Strieff* and took it out of context.

The parties agree that the first factor, the time elapsed between the unlawful conduct and the acquisition of evidence, weighs in favor of suppression because the unlawful seizure of Hollist was separated by only a few minutes from Hollist's unlawful seizure and the discovery of contraband in Hollist's possession. We agree with Hollist and the State that the first factor favors suppression; mere minutes elapsed between Okopny placing Hollist in handcuffs and the discovery of the pipe and methamphetamine. The length of the entire interaction between Hollist and Okopny is approximately twenty minutes; Hollist was placed in handcuffs about two minutes into the video, and an officer began searching his belongings about eight minutes into the video. The parties also agree that the second factor, intervening circumstances, favors inclusion of the evidence because "[t]he discovery of an arrest warrant as an intervening circumstance 'strongly favors the State.'" *Cohagan*, at 722, 404 P.3d at 664 (quoting *Strieff*, 579 U.S. at 233). Again, we agree with the parties that the second factor favors inclusion of the evidence.

The only real dispute between the parties regarding the application of the attenuation doctrine is the third factor – whether Okopny's conduct was flagrant or purposeful. "The purpose of the exclusionary rule, under federal law, is to deter police misconduct. Accordingly, the third factor only favors exclusion 'when the police misconduct is most in need of deterrence—that is, when it is *purposeful* or *flagrant*.'" *Id.* at 722–23, 404 P.3d at 664–65 (italics in original) (internal citations omitted).

In *Strieff*, an officer was conducting a "bona fide investigation" of a known drug house when he observed Strieff exit the house. 579 U.S. at 235–36. The officer approached Strieff, asked for identification, and learned of an outstanding warrant for Strieff's arrest. *Id.* In discussing the purposeful or flagrant nature of the officer's conduct, the Supreme Court concluded that, at most, the officer's conduct was merely negligent: "While Officer Fackrell's decision to initiate the stop was mistaken, his conduct thereafter was lawful. The officer's decision to run the warrant check was a 'negligibly burdensome precautio[n]' for officer safety." *Id.* at 241 (quoting *Rodriguez v. United States*, 575 U.S. 348, 356 (2015)).

In contrast, in *Cohagan*, two officers observed a man enter a grocery store. *Cohagan*, 162 Idaho at 719, 404 P.3d at 661. The officers thought the man resembled someone who had an outstanding warrant. *Id.* The officers followed the man, Cohagan, into the grocery store. *Id.* The

first officer approached Cohagan and asked him for identification. Upon viewing the identification, that officer concluded that Cohagan was not the person they had suspected. *Id.* After leaving the store and then returning for a different purpose, the second officer also decided to approach Cohagan to verify his identity. *Id.* Upon approaching Cohagan, the second officer later admitted that he knew Cohagan was not the person the officers suspected of having an outstanding warrant, yet the officer chose to ask Cohagan for his identification anyway. *Id.* Upon running Cohagan's name through dispatch, the officers discovered an outstanding warrant, which led to a search incident to arrest during which they found methamphetamine. *Id.* at 719–20, 404 P.3d at 661–62.

This Court concluded that the second officer's conduct in *Cohagan* "was nothing more than 'a suspicionless fishing expedition in the hope that something would turn up.' Such purposeful conduct is simply untenable and is exactly the type of flagrantly unlawful conduct the Fourth Amendment is designed to protect against." *Id.* at 724, 404 P.3d at 666 (internal citations and quotations omitted). As such, despite this Court concluding that the discovery of the arrest warrant favored attenuation, it held that "discovery of the evidence was not sufficiently attenuated from the illegal stop as to break the causal chain between the unconstitutional stop and the discovery of the evidence." *Id.* at 726, 404 P.3d at 668.

In this case, Okopny's conduct falls closer to that of the officers in *Cohagan* than the officer in *Strieff*. Unlike in *Strieff*, where the officer was investigating a known drug house when he approached the defendant, here, Okopny was merely responding to what he thought was initially an emergency medical situation of a male lying on the canal bank. Admittedly, sleeping on a canal bank at 9 a.m. is unusual; however, it is not unlawful, and Okopny was not responding to any report of criminal activity. Instead, the original purpose of the call was akin to a public safety or welfare check to ensure that Hollist was not in need of emergency medical services. Hollist quickly dispelled any justification for a caretaking function.

Like the second officer in *Cohagan*, who was intent on identifying Cohagan despite knowing that he was not the person he had suspected, Okopny insisted on detaining Hollist until he identified himself, apparently for the sole purpose of learning whether he had any outstanding warrants. This Court made clear in *Page* that officers have no right to detain a pedestrian solely for this purpose. Okopny's fixation on identifying Hollist, despite Hollist's multiple attempts to leave, crosses beyond the line of negligent conduct, and instead falls in the realm of purposeful and flagrant conduct. As discussed above, Okopny was fixated on determining whether Hollist had

14

any outstanding warrants based on no particularized suspicion. This Court disapproves of officers engaging in suspicionless fishing expeditions. *See Cohagan*, at 724, 404 P.3d at 666.

In further support of this conclusion, we note that both Okopny and another officer made statements during Hollist's arrest that erroneously indicated to Hollist that he was legally compelled to identify himself to law enforcement when asked. As we stated in *Cohagan*, "the training that law enforcement officers receive regarding the law of search and seizure should play a role in evaluating the flagrancy of their behavior." 162 Idaho at 725, 404 P.3d at 667. Specifically, Okopny told Hollist that if he failed to identify himself it would result in additional charge against him.

The following conversation occurred between the second officer who responded to the scene and Hollist approximately five and a half minutes after Okopny came upon Hollist:

Hollist: I don't have to identify myself.

Unknown officer: You absolutely have to identify yourself. Absolutely.

Hollist: Well, if I'm not driving?

Officer: It doesn't matter. We got a call out here to check on you, and that's what we do.

Hollist: But I legally don't have to.

Officer: No, you're wrong. I'm telling you you're wrong right now. I don't know – I don't know if you read that in a book or somebody in jail told you that, that you don't have to identify yourself, but it is wrong.

Neither officer present during the search and eventual arrest of Hollist were acting in accord with well-established law. We have no reason to believe the officers were intentionally misstating the law, but the third factor of the attenuation doctrine does not depend upon *intentional* misstatements. Since 2004 it has been the law in Idaho that an officer may not detain a pedestrian solely to obtain his identification. We, therefore, conclude that Okopny's (and the second officer's) conduct was purposeful and flagrant.

Two of the three factors this Court uses to determine whether an officer's unconstitutional conduct was sufficiently attenuated from the discovery of incriminating evidence weigh in favor of suppressing the evidence found on Hollist upon his arrest. As a result, we hold that when balancing the attenuation factors they weigh heavily in favor of suppressing the evidence incriminating Hollist. Therefore, the State has failed to establish that the discovery of contraband on Hollist was sufficiently attenuated from Okopny's unlawful seizure to break the causal chain.

15

As such, the exclusionary rule applies, and the evidence should have been suppressed.

## IV. CONCLUSION

Based on the above analysis, we reverse the district court's denial of Hollist's motion to suppress and remand the case for further proceedings consistent with this opinion.

Justices BRODY and ZAHN CONCUR.

MOELLER, Justice, dissenting.

Although I have no disagreement with the legal framework upon which the majority has analyzed this case, I must respectfully dissent from the result. Simply put, I disagree with the factual determinations the majority makes upon reviewing the same evidence that the district court reviewed. Because my own view of the record coincides with that of the district court, I would affirm its decision to deny the motion to suppress.

The standard of review applied in this case is admittedly unusual. As noted by the majority, we typically defer to the trial court's findings of fact as long as they are not "clearly erroneous." *State v. Amstutz,* 169 Idaho 144, 146, 492 P.3d 1103, 1105 (2021). In *State v. Hutton*, 169 Idaho 772, 503 P.3d 972, 975–76 (2022), we recently explained how we apply this standard:

> In review of a trial court's denial of a motion to suppress evidence, this Court defers to the trial court's findings of fact, "which will be upheld so long as they are not clearly erroneous." *State v. Bishop*, 146 Idaho 804, 810, 203 P.3d 1203, 1209 (2009). Factual findings are not clearly erroneous as long as they are supported by substantial and competent evidence. *Id*. at 810, 203 P.3d at 1209.

Yet, because this appeal presents the unique circumstance "where this Court has exactly the same evidence before it as was considered by the district court, " our case law suggests that we may conduct a de novo review of the evidence and weigh it accordingly, as held in *State v. Andersen*, 164 Idaho 309, 312, 429 P.3d 850, 853 (2018). *See also State v. Lankford*, 162 Idaho 477, 491, 399 P.3d 804, 818 (2017). Here, regardless of whether we apply a clearly erroneous standard or review the record de novo, I find that my view of the evidence is consistent with that of the district court.

The majority opinion contains a few brief paragraphs from the district court's oral ruling; however, the transcript shows that the district court made extensive findings. Even without affording deference to the trial court's findings, I find that my own view of the evidence matches the determinations of the district court in denying the motion to suppress. A few examples of those findings are excerpted here:

THE COURT: I would note that the defendant is inches from the canal and in the weeds. And I would note that his feet are very close, if not, you know, very near to the water. . . . And the court observes the defendant stumble a bit on his feet and is unsteady, and the Court perceives as being unsure on his feet.

And as I speak to both counsel and the defendant, let me just invite —— Mr. Hollist, have you seen the video as well?

THE DEFENDANT: I have not seen the video.

THE COURT: Okay. So you may or may not have —

THE DEFENDANT: I was just waking up.

THE COURT: — with your counsel, but certainly this Court sees that you were unsure on your feet. I would characterize you as a [sic] stumbling. The officer asks you if you need any medical attention, and you reply, "No, no." The officer then gets on his radio and calls off any sort of medical request.

At that point the defendant begins to walk away from the officer, and the officer continues to engage in a conversation with you. The Court makes the observation that you appear stumbling, disorganized, and having been horizontal on the ground, up on your feet, and there's some concern that the Court sees that you appear not to be completely well.

The officer makes some additional statements as you are walking away from him, such as, "I just need to make sure you are all right."

After recounting these facts, which accurately depict what I, too, observed on the officer's body-cam video, the district court explained its ruling:

THE COURT: As the Court suggested, this is all captured on video. And the Court makes the observation that the officer was, in fact, engaged in the community-caretaking function and was making a determination whether this individual, the defendant that is in the courtroom today, was well enough to simply leave.

The officer continues to ask additional questions of the defendant while the defendant is walking away, and even after being detained, ascertaining his name and his date of birth. There was a conversation between the two as to whether or not there would be a warrant.

This Court believes that even if the officer had called off the medical request, such as an ambulance or other medical response, that the officer continues to engage in the community—caretaking function by asking such questions as the name of the defendant, and whether the defendant is okay, given the proximity to the canal.

. . .

But here, the community caretaking includes the individual that is standing next to a swift-moving body of water. If the defendant is intoxicated or under the influence, there is, in the Court's mind, obvious concerns that the defendant could slip in and potentially lose his life.

At the hearing of the preliminary hearing, the Court also takes note of the testimony of the officer, where he states, "I did not want him to fall into the canal

17

bank or go up to the homes and get run over by a car, because I wasn't sure where his mental state was at the time."

That officer's testimony is consistent with the Court's observations that I saw and the concerns that this Court would have interacting with this individual.

He later testified on cross-examination that "The defendant's feet were basically in the water, and I was worried that a normal person doesn't just go fall asleep because it's warm on a canal bank." And he wanted to make sure he was mentally/physically okay to be able to continue where he was going.

Likewise, the Court makes the observation from the video that, given the slope of the canal bank, the fact that weeds grow from within the water above the water surface and where the defendant was lying upon the officer's approach, and the fact that the defendant stands and stumbles and has the speech that the Court heard and observed, this Court likewise finds the officer's testimony consistent and credible.

He also testified, the officer, that he was trying to get the ID of the defendant to see if he had any previous medical calls or emergencies or whether there was any diabetic [sic] or anything like that or maybe in diabetic shock.

While I apologize for including such lengthy excerpts from the transcript, it was necessary to fully appreciate the careful and thoughtful ruling of the district court. My viewing of the body-cam video confirms these findings. Additionally, I note that the video shows that Hollist was deep asleep and lying *face-down* on the edge of canal bank when he was discovered by the officer at approximately 9:00 AM on a Saturday morning. This is hardly the time when one would typically take a leisurely summer's nap in the sun. When he was awakened by the officer, he is startled and almost falls into the canal. Once he stood up, he was clearly unsteady and stumbled backwards towards the canal at least once. It is also obvious that he was in a hurry to leave the scene and get away from the officer. When asked about warrants, he gives an ambiguous answer and repeatedly disregards the officer's instructions. After multiple viewings of the video, I must conclude—as the district court did—that the officer was properly acting in his community caretaker role. Furthermore, while doing so, he developed reasonable suspicion that Hollist was publicly intoxicated or under the influence of controlled substances based on the totality of the circumstances. *See* Idaho Code §§ 37-2732C and 49-1426. Because I conclude there was reasonable suspicion, there is no need to address Hollist's attenuation argument.

While the majority might ascribe an innocent explanation for Hollist's behavior, this does not undermine the reasonable conclusions drawn by the investigating officer. "[T]he existence of alternative innocent explanations does not necessarily negate reasonable suspicion." *State v. Danney*, 153 Idaho 405, 411, 283 P.3d 722, 728 (2012). More recently, we have acknowledged that "innocent acts, when considered together, may be suspicious enough to justify an investigative

18

detention if an officer points to articulable facts that the individual is engaged in criminal activity." *State v. Gonzales*, 165 Idaho 667, 674, 450 P.3d 315, 322 (2019) (citations omitted). *See also State v. Pylican*, 167 Idaho 745, 752, 477 P.3d 180, 187 (2020), reh'g denied (Oct. 1, 2020).

We can only imagine the calamities that might have befallen the defendant as he stumbled about and attempted to leave the scene on a small child's bicycle. Important to this case, the record clearly demonstrates that the officer's actions were motivated by concern for the defendant's safety. This Court has been clear that "[t]he community caretaker function arises from the duty of police officers to help citizens in need of assistance." *State v. Wixom*, 130 Idaho 752, 754, 947 P.2d 1000, 1002 (1997), citing *State v. Page*, 140 Idaho 841, 844, 103 P.3d 454, 457 (2004). To apply this exception, the State must establish that the officer's detention was motivated by "genuine and warranted concern" for the defendant. *Page*, 140 Idaho at 844, 103 P.3d at 457. I agree with district court's finding that the officer in this case was "engaged in the community-caretaking function and was making a determination whether [the defendant] . . . was well enough to simply leave." Therefore, I would likewise conclude that the State met its burden under *Page*.

Human experience teaches that reasonable minds may differ even when they are perceiving the same event. Indeed, after viewing the same video, the majority and the dissent apparently disagree on whether Hollist was lying face-down. Like all judges, we ultimately view such matters through the lens of our own personal experiences in law and life. Therefore, I respect my colleagues' differing points of view. For me, my review of the record aligns with that of the district court and confirms that the responsible and altruistic behavior exhibited by law enforcement in this case was consistent with—and, in fact, lies at the very core of—the community caretaker exception to the Fourth Amendment. Therefore, I respectfully dissent.

Chief Justice BEVAN CONCURS.

19